UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

|  |  |  |
|---|---|---|
| | Plaintiff, | Cr. No. 19-20651 |
| v. | | |
| | | Hon. Linda V. Parker |

WILLIE ALDRIDGE,

Defendant.

_____/

## MOTION FOR COMPASSIONATE RELEASE

Willie Aldridge, through counsel Colleen P. Fitzharris, moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction in light of the extraordinary and compelling reasons created by the COVID-19 pandemic. In support of the motion, she states as follows:

(1) In November 2019, Ms. Aldridge pled guilty to theft of government funds. In March 2020, this Court imposed a five-month term of imprisonment to be followed by seven months' home detention. (R. 13, Judgment, PgID 50–51, 53)

(2) This Court recommended that the Bureau of Prisons designate Ms. Aldridge to a medical facility because of her significant, documented medical conditions. This Court also permitted Ms. Aldridge to self-report to the BOP. (R. 13, Judgment, PgID 50) The BOP designated Ms. Aldridge to Federal Medical Center Carswell in Texas.

(3) Since Ms. Aldridge's sentencing, the COVID-19 pandemic has emerged as an international emergency.

(4) Ms. Aldridge, a Black woman, will be 77 years old soon. She suffers numerous health conditions, including dysphagia, acute kidney injury, Type II diabetes with neuropathy, essential hypertension, hyperlipidemia, asthma, peptic ulcer disease, deep vein thrombosis, temporal arteritis, and osteoarthritis. She uses a cane or walker to move about. (PSR ¶¶ 47–51; Ex. A, Beaumont Medical Records)

(5) The Centers for Disease Control has identified many of these conditions and age as risk factors for severe COVID-19 illness or death.[1] And COVID-19 could exacerbate her other medical conditions, including deep vein thrombosis, peptic ulcers, dysphagia, and acute kidney disease. In short, Ms. Aldridge is at great risk if she is infected and gets sick with COVID-19.

(6) The BOP has struggled mightily to contain the spread of COVID-19 because prisons are not built for social distancing. The chances are low that prison will be a safe place for Ms. Aldridge to report to any time soon.

---

[1] Ctr. for Disease Control, *People at Increased Risk: People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Dec. 2, 2020).

(7) In light of this fact, this Court has extended Ms. Aldridge's report date three times. Ms. Aldridge was fully prepared to report and serve her sentence. But the risks to her health are too great.

(8) Ms. Aldridge asks this Court to reduce her sentence to time served to be followed by a 12-month period of home detention.

(9) Counsel sought concurrence from government counsel before submitting the request to the warden. The government does not concur with the relief requested.

## CONCLUSION

In light of the extraordinary conditions created by the COVID-19 pandemic and Ms. Aldridge's numerous health conditions, this Court should reduce the sentence to time served to be followed by a 12-month period of supervised release with a special condition of home detention.

Respectfully submitted

**FEDERAL COMMUNITY DEFENDER**

s/ Colleen P. Fitzharris
Attorney for Willie Aldridge
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5868
E-mail: colleen_fitzharris@fd.org

Date:  December 7, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,                   Criminal Case No. 19-20651

   v.

                                     Hon. Linda V. Parker

WILLIE ALDRIDGE,

              Defendant.

_____/

**BRIEF IN SUPPORT OF**
**MOTION FOR A SENTENCE REDUCTION**

Willie Aldridge is a 76-year-old Black woman who has been diagnosed dysphagia, acute kidney injury, Type II diabetes with neuropathy, essential hypertension, hyperlipidemia, asthma, peptic ulcer disease, deep vein thrombosis, temporal arteritis, and osteoarthritis. She uses a cane or walker to move about. (PSR ¶¶ 47–51; Ex. A, Beaumont Medical Records) These conditions make Ms. Aldridge particularly vulnerable to severe illness, hospitalization, or death if she becomes ill with COVID-19. She did not commit a violent offense and has made efforts since her sentencing to begin paying restitution.

The COVID-19 pandemic is devastating the Bureau of Prisons. To date, 149 incarcerated people have died in the custody of the BOP due to complications of

COVID-19. 27,148 incarcerated people have been infected with the virus.[2] FMC Carswell alone, where Ms. Aldridge is designated to serve her sentence, reports that 503 people have tested positive for the virus and six have died.[3]

But for the pandemic, Ms. Aldridge would report as directed to the BOP to serve her sentence. Unfortunately, requiring Ms. Aldridge to travel to Texas to serve a five-month sentence puts her at an intolerable risk. Her age and medical conditions render her particularly susceptible to severe illness, hospitalization, or death from COVID-19. Ms. Aldridge therefore moves pursuant to 18 U.S.C. § 3582(c)(1)(A)(i): (1) for an order reducing her sentence to time served to be followed by a 12-month term of supervised release with a special condition that she serve that time in home detention.

## BACKGROUND

Willie Aldridge is nearly 77 years old. She was born and raised in Alabama, where she lived until she moved to Michigan to attend school. She earned a Bachelor of Science, a Master of Science in Teaching, and a Doctor of Education in Leadership. Ms. Aldridge spent her life as an educator or administrator in Pontiac Public Schools until she was terminated in 2002.

Ms. Aldridge's life spiraled out of control after her mother died in June 2000. Just six months later, after a lifetime of working for kids and living crime-free, Ms. Aldridge was accused of embezzlement. She also began accepting her mother's

---

[2] Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed Dec. 2, 2020).
[3] *Id.*

2

Social Security benefits to which she was not entitled. Ms. Aldridge ultimately pled no contest to embezzlement, lost her job, her source of income, and her sense of purpose.

In 2018, when agents discovered Ms. Aldridge's fraud, she confessed and sought to make it right. In 2019, she accepted responsibility and pled guilty. Before then, Ms. Aldridge never attempted to evade responsibility or run. She complied with pretrial supervision. In March 2020, this Court imposed a 5-month sentence to be followed by a 7-month period of home detention. Since then, Ms. Aldridge has agreed to a repayment plan and begun making payments.

Shortly after this Court imposed sentence, the President and Michigan Governor declared national and state emergencies because of the deadly COVID-19 pandemic. Ms. Aldridge's health worsened, too. Even so, Ms. Aldridge made plans to report to FMC Carswell. When it became clear that travel to Texas and incarceration could be fatal, she requested three adjournments to the report date. She also sought a reduction of sentence from the warden of FMC Carswell.

## LEGAL STANDARD

A defendant can file a motion to reduce his sentence after requesting that the Bureau of Prisons file a motion for compassionate release. After 30 days lapse or full "exhaust[ion of] all available rights to appeal," the defendant may file her own motion in the district court. 18 U.S.C. § 3582(c)(1)(A).

To grant a sentence reduction, a district court must make three findings. First, the court must find "extraordinary and compelling reasons warrant" a sentence

<center>3</center>

reduction. 18 U.S.C. § 3582(c)(1)(A)(i). Second, the court "must 'find[ ]' whether "such a reduction is consistent with *applicable* policy statements issued by the Sentencing Commission."[4] "In cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13" because it is no longer "applicable."[5] In motions like these, initiated by a defendant, after finding "extraordinary and compelling circumstances, it may "consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case."[6]

## DISCUSSION

### A. A sentence reduction is an available remedy to defendants who have been sentenced but have not surrendered

Nothing in the text of 18 U.S.C. § 3582(c)(1) limits a court's authority to reduce the sentence for a person who has not yet reported to prison. "Statutory interpretation . . . begins with the text."[7]

The text indicates that district courts may "reduce the term of imprisonment" "in any case" where three conditions are met: (1) exhaustion of administrative remedies

---

[4] *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *6 (6th Cir. Nov. 20, 2020) (quoting 18 U.S.C. § 3582(c)(1)(A) (emphasis added)).

[5] *Id.* at *9.

[6] *Id.* at *6 (quotation marks omitted).

[7] *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).

4

or the lapse of 30 days from receipt of the request; (2) "extraordinary and compelling reasons warrant[ing] such a reduction"; and (3) "a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1). The text does not expressly require that the person moving for a sentence reduction be in custody.[8] "Indeed, the relief available under the statute—a reduction in sentence, and not, specifically, release from custody—implies that the only absolute requirement is that a defendant be subject to a federal sentence."[9]

To be sure, two district courts have held that a motion under § 3582(c)(1) is premature if filed before a defendant reports to the BOP.[10] But neither of these opinions engage with the text of the statute in any meaningful way. In *Spuill*, the court simply stated that the defendant, in fact, sought "re-sentencing because he moved for modification of his sentence before he reported to the Bureau of Prisons" without any reference to the text of § 3582(c)1).[11] Similarly, in *Konny*, the court announced, "the section applies only to those defendants who have begun serving their term of imprisonment at a BOP facility," citing only *Spuill* for authority.[12]

This conclusion seems to derive from the fact that, before filing, someone must first "fully exhaust[] all administrative rights to appeal a failure of the [BOP] to bring a

---

[8] *United States v. Austin*, No. 06-CR-991 (JSR), 2020 WL 3447521, at *1, *2 (S.D.N.Y. June 22, 2020).
[9] *Id.*
[10] *See United States v. Konny*, 463 F. Supp. 3d 402, 404 (S.D.N.Y. 2020); *United States v. Spruill*, 18-cr-22 (VLB), 2020 WL 2113621, at *3 (D. Conn. May 4, 2020).
[11] 2020 WL 2113621, at *3.
[12] 463 F. Supp. 3d at 404.

motion on the defendant's behalf." 18 U.S.C. § 3582(c)(1)(A). But that only indicates that the BOP has a role to play in the process, not that the remedy is limited to those in custody. Numerous courts have entertained motions for a sentence reduction for people in private prisons without wardens,[13] county jails,[14] and halfway houses.[15] And various district courts have reduced the sentences of people who had not yet reported to the BOP.[16]

"To hold otherwise — that is, to find [someone] ineligible to bring the instant motion today, but eligible . . . only after suffering the severe and irreversible disruption that [reporting] to prison would cause—would be a hypertechnical and inequitable

---

[13] *See, e.g.*, *United States v. Olawoye*, No. 1:15-CR-172-AA, ECF 383 (D. Or. Aug. 7, 2020) (granting release to individual detained in private prison); *United States v. Burrus*, No. CR 19-284, 2020 WL 3799753, at *3 (W.D. Pa. July 7, 2020) (government conceded exhaustion because the defendant was not in BOP custody).

[14] *See, e.g.*, *United States v. Jacobs*, No. 19-149 (RP-HCA), ECF 84 (S.D. Iowa July 2, 2020) (granting release to defendant detained in county jail; government conceded exhaustion); *United States v. Morrison*, No. 19-284 (PWG), ECF 44 (D. Md. June 24, 20) (granting release to defendant detained in regional jail; government conceded exhaustion); *United States v. Jackson*, No. 02-30020 (MFU), ECF 1528 (W.D.V.A. May 26, 2020) (granting release to defendant detained at local jail; government conceded exhaustion); *United States v. Johnson*, ___F. Supp. 3d ___, 2020 WL 3041923, at *10 (D.D.C. May 16, 2020) (granting compassionate release from local jail).

[15] *See, e.g.*, *United States v. Gonzalez-Quiroz*, No. 18-4517 (DMS), ECF 84 (S.D.C.A. July 9, 2020) (granting compassionate release to defendant in halfway house); *United States v. Gamboa*, No. 09-1741 (JAP), ECF 123 (D.N.M. June 11, 2020) (granting compassionate release to defendant serving remainder of sentence under home confinement); *United States v. Damian Campagna*, No. 16-78 (LGS), 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (granting motion of defendant in halfway house).

[16] *United States v. Woolley*, No. 9:19-CR-80093, 2020 WL 4904210, at *1–2 (S.D. Fla. Aug. 20, 2020); *Untied States v. Butler*, No. 14-cr-445-2, ECF 188, PgID 600 (N.D. Ill. Apr. 6, 2020) (Attached as Ex. C); *United States v. Konopka*, No. 17-CR-616, ECF 117, PgID 907 (N.D. Ill. Sept. 10, 2020) (Attached as Ex. D); *United States v. Nazario-Monjito*, No. 17-cr-00278, Dkt. # 273 (D.P.R. Sept. 24, 2020) (Attached as Ex. E).

result[.]"[17] The injustice of limiting Ms. Aldridge's access to this remedy would conflict with Congress' goal of "boost[ing] grants of compassionate release by reforming § 3582(c)(1)(A)'s procedures."[18]

### B. This motion is ripe

Through counsel, Ms. Aldridge submitted a request for compassionate release to the warden of FMC Carswell on October 30, 2020. (Ex. B, Comp. Release Request) Nobody from the prison confirmed receipt of the letter or responded in any way. Because 30 days have lapsed since Ms. Aldridge submitted her request, this Court may consider her motion for compassionate release.[19]

This Court would not be alone in finding that this satisfies the exhaustion requirement. In *Woolley*, the district court converted a five-month sentence for fraud to a sentence of home confinement in light of the COVID-19 pandemic and his medical conditions.[20] Before reporting to serve his sentence, the defendant submitted a request for compassionate release to the warden of the designated prison, which the government agreed was sufficient for purposes of exhaustion.[21] In *Butler*, the district court found that the defendant exhausted available remedies because 30 days had lapsed

---

[17] *Austin*, 2020 WL 3447521, at *3.

[18] *Jones*, 2020 WL 6817488, at *4 (citing 164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018) and collecting statements congressional representatives and senators).

[19] *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020); *United States v. Thrower*, No. 04-CR-903 (ARR), 2020 WL 6128950, at *5–6 (E.D.N.Y. Oct. 19, 2020) (finding the exhaustion requirement satisfied or waived for a pre-surrender movant who submitted a request for compassionate release to the warden of the designated prison).

[20] *Thrower*, 2020 WL 4904210, at *1–2.

[21] *Id.*

since the date he submitted his request for compassionate release to the warden of the prison to which he was designated.[22] In *Konopka*, yet another district court found that the defendant exhausted his available remedy after he submitted a request to the warden of the designated facility.[23] Because Ms. Aldridge exhausted the only available remedies she has, this Court may now consider her motion.

### C. There are extraordinary and compelling reasons to reduce Ms. Aldridge's sentence

COVID-19's hospitalization and death rates go up the older you are and the sicker you are. Ms. Aldridge is at an increased risk for both reasons.

*Age.* The death rate increases dramatically with age. The CDC explains that anyone over the age of 65 has a greater risk for severe illness from COVID-19.[24]

Compared to younger adults, older adults are more likely to require hospitalization if they get COVID-19

|  | Hospitalization[1] | Death[2] |
|---|---|---|
| 18-29 years | Comparison Group | Comparison Group |
| 30-39 years | 2x higher | 4x higher |
| 40-49 years | 3x higher | 10x higher |
| 50-64 years | 4x higher | 30x higher |
| 65-74 years | 5x higher | 90x higher |
| 75-84 years | 8x higher | 220x higher |
| 85+ years | 13x higher | 630x higher |

---

[22] No. 14-cr-445-2, ECF 188, PgID 600.
[23] No. 17-CR-616, ECF 117, PgID 907.
[24] Ctr. for Disease Control, *People at Increased Risk: Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Dec. 2, 2020).

Acknowledging the sad reality that elderly people are more vulnerable, numerous district courts have acknowledged that people 65 and older should be released to home confinement.[25]

Ms. Aldridge is just shy of her 77th birthday. She requires a cane or walker to move about. (Ex. A, Medical Records, ALDRIDGE_158) She is therefore at significant risk of hospitalization or death if she becomes sick with COVID-19.

*Type II Diabetes.* Ms. Aldridge has long had Type II diabetes, which has caused neuropathy. (Ex. A, Medical Records, ALDRIDGE_003) Diabetes is monitored with "A1c" readings, measuring blood sugar levels, and a score over 6.7% equates to diabetes, with most diabetic adults having a target level of 7% or less.[26] At her most recent A1c reading, in June 2020, her A1c level was 7.5%. (*Id.*, 090) In April 2020, her A1c level was 8.9%. (*Id.*, 099)

The CDC lists Type II diabetes as one of the conditions that "increases your risk of severe illness from COVID-19."[27] In other cases, the government has conceded that the combination of COVID-19 and Type II diabetes constitute an "extraordinary and

---

[25] *E.g.*, *United States v. Williams*, Case No. 04-cr-95/MCR, at *7 (N.D. Fla. April 1, 2020); *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020).

[26] *See* Mayo Clinic, *A1C Test Description*, https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643.

[27] Ctr. for Disease Control, *People at Increased Risk: People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Dec. 2, 2020).

compelling" reason within the meaning of § 3582(c).[28] Judges in this district have granted compassionate release on this basis.[29] This district is not alone.[30]

*Hypertension.* Ms. Aldridge suffers from hypertension. (Ex. A, Medical Records, 002) Hypertension is usually defined as blood pressure above 140/90, and is severe if the pressure is above 180/120.[31] When Ms. Aldridge went to the emergency room less than two months ago, on October 13, 2020, her blood pressure was 117/56, which is actually considered to be too low. (*Id.*, 021) But her medical records consistently list essential hypertension as one of the chronic illnesses Ms. Aldridge has suffered for the past couple years. (*See, e.g.*, 002, 101, 142 (BP 157/80))

---

[28] *United States v. Ford*, No. 00-80974, Dkt. # 112, Gov't Resp., PgID 378).

[29] *See United States v. Rahim*, No. 16-20433, 2020 WL 2604857, at *2–3 (E.D. Mich. May 21, 2020) (Edmunds, J.); *United States v. Doshi*, No. 2:13-cr-20349-AJT-LJM-1, 2020 WL 2556794 (E.D. Mich. May 20, 2020) (Tarnow, J.); *United States v. Agomuoh*, No. 5:16-cr-20196-JEL-RSW-1, 2020 WL 2526113 (E.D. Mich. May 18, 2020) (Levy, J.); *United States v. Al-Jumail*, No. 12-20272, 2020 WL 2395224, at *6 (E.D. Mich. May 12, 2020) (Hood, C.J.); *United States v. Reddy*, No. 13-CR-20358, 2020 WL 2320093, at *7 (E.D. Mich. May 11, 2020) (Leitman, J.).

[30] *See, e.g.*, *United States v. Cotinola*, No. 1:13-cr-03890-MV-1, 2020 WL 2526717 (D. N.M. May 18, 2020); *United States v. Sholler*, No. 17-CR-00181-SI-1, 2020 WL 2512416 (N.D. Cal. May 15, 2020); *United States v. Ennis*, No. 3:02-cr-01430-PRM-1, 2020 WL 2513109 (W.D. Tex. May 14, 2020); *United States v. Mattingly*, No. 6:15-cr-00005-NKM-JCH, 2020 WL 2499707 (W.D. Va. May 14, 2020).

[31] The Mayo Clinic, *High Blood Pressure (hypertension)*, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/symptoms-causes/syc-20373410 (last visited Dec. 2, 2020).

High blood pressure, particularly in elderly people, creates a serious risk of severe illness or death from COVID-19. Courts recognize this.[32] The CDC also acknowledges that those with hypertension might be at an increased risk for severe COVID-19 illness.

And they recognize it because it is true. As the epidemiologist Katie Lin Brasher-Beaudry has explained, "the majority of credible data and research related to the relationship between [primary] hypertension and COVID-19 suggests that hypertension puts patients at a higher risk of becoming ill with COVID-19, experiencing severe symptoms, being hospitalized and/or dying."[33] In fact, hypertension is *the leading* comorbidity for becoming severely infected with COVID-19.[34] High blood pressure is the most common comorbidity for persons admitted to the hospital in the U.S. for COVID-19 treatment.[35]  In one study, 63% of patients with

---

[32] *See, .e.g., United States v. Foreman*, 2020 WL 2315908, at *3 (D. Conn. May 11, 2020) (granting compassionate release to a 58-year-old woman with essential primary hypertension); *see also Segars v. United States*, 2020 WL 3172734, at *3 (E.D. Mich. June 15, 2020) (rejecting argument that only pulmonary hypertension is an extraordinary and compelling risk factor); *United States v. Salvagno*, ---F. Supp.3d ---, 2020 WL 3410601, at *26 (N.D.N.Y. Apr. 23, 2020) (finding presence of hypertension is an extraordinary and compelling reason).

[33] *United States v. White*, No. 13-cr-20653-1, Dkt. No. 51-1, pageID.687 (E.D. Mich.).

[34] *See* Adekunle Sanyaolu, *Comorbidity and Its Impact on Patients with COVID-19*, 2020 SN Compr. Clin. Med. 1 (June 25, 2020) (prepublication; available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7314621/) ("The *most common comorbidities* identified in [a meta-analysis of patients with COVID-19] were hypertension (15.8%), cardiovascular and cerebrovascular conditions (11.7%), and diabetes (9.4%).").

[35] *See* Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, J. of the Am. Med. Ass'n (Apr. 22, 2020) (listing hypertension as the most common comorbidity, present in 56.6% of cases studied), available at https://jamanetwork.com/journals/jama/fullarticle/2765184 ("New York City Study").

COVID-19 in the ICU had baseline hypertension.[36] The CDC also analyzed clinical COVID-19 data from China and concluded that case fatality was higher for patients with hypertension.[37] Of patients in China with no reported underlying medical conditions, the case fatality rate was 0.9%; for those with hypertension, the case fatality rate was approximately 6%.[38] For these reasons, the Secretary of the Department of Health and Human Services recognizes "hypertension increases the likelihood of severe complications from COVID-19."[39]

*High Cholesterol.* The CDC recognizes "hyperlipidemia, along with other chronic diseases, as prevalent in patients hospitalized due to COVID-19."[40] Statistics from New York health authorities, which keep detailed records of comorbidities, reveal that this condition is the third leading comorbidity in COVID-19 deaths, behind only

---

[36] Nancy A. Anoruo, M.D., M.P.H., *Having high blood pressure may make coronavirus more dangerous*, ABC News (Jun. 1, 2020), https://abcnews.go.com/US/high-blood-pressure-make-coronavirus-dangerous/story?id=70991996.

[37] *See* CDC, *Interim Clinical Guidance for Management of Patients with Coronavirus Disease (COVID-19)*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed Apr. 30, 2020) (listing hypertension as condition "associated with increased illness severity and adverse outcomes").

[38] *Id.*

[39] *United States v. Goins*, No. 11-CR-20376, 2020 WL 3064452, at *5 (E.D. Mich. June 9, 2020) (citing Kristen Holmes & Kevin Bohn, *Azar Lays Part of Blame for COVID-19 Death Toll on State of Americans' Health*, CNN (May 17, 2020), https://www.cnn.com/2020/05/17/politics/us-health-conditions-coronavirus-alex-azar-cnntv/index.html (quoting Health and Human Services Secretary Alex Azar) ("[I]f we have hypertension, if we have diabetes, we present with greater risk of severe complications from corona – from this coronavirus.").

[40] *Cotton v. United States*, No. CR 16-20222-8, 2020 WL 3488752, at *3 (E.D. Mich. June 26, 2020).

hypertension and diabetes.[41] Courts thus have cited high cholesterol when granting compassionate release, even when a person is at a facility with no confirmed COVID-19 cases.[42]

*Asthma.* Asthma is an incurable respiratory disease. The American Academy of Allergy Asthma and Immunology explains, "[i]f you have asthma your airways are always inflamed. They become even more swollen and the muscles around the airways can tighten when something triggers" symptoms "mak[ing] it difficult for air to move in and out of the lungs."[43] When this happens, an asthmatic person experiences coughing, wheezing, shortness of breath and/or chest tightness.[44]

"People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19. COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[45]

---

[41] N.Y. Tracker, https://rb.gy/zammch (last accessed Oct. 1, 2020).

[42] *See Cotton*, 2020 WL 3488752, at *3 (granting release to 64-year-old inmate with obesity, hyperlipidemia, asthma, and prediabetes); *United States v. Diep Thi Vo*, No. 15-CR-00310-BLF-2, 2020 WL 2300101, at *3 (N.D. Cal. May 7, 2020) (granting release to inmate with hyperlipidemia and hypertension); *United States v. Pena*, No. 15-cr-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) (granting release to inmate suffering from hypertension and hyperlipidemia).

[43] Asthma Overview, AAAAI, https://www.aaaai.org/conditions-and-treatments/asthma (last visited July 7, 2020).

[44] *Id.*

[45] CDC, *People Who Need Extra Precautions: People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#asthma (last visited Nov. 23, 2020).

Because of the heightened risks of a COVID-19 infection that asthmatics face, numerous courts have granted compassionate release to those with asthma.[46]

*Acute Kidney Injury.*   In October 13, 2020, Ms. Aldridge went to the emergency room because she was having significant difficulty swallowing and vomiting. While there, doctors diagnosed her with acute kidney injury (AKI). (Ex. A, Medical Records, ALDRIDGE_029–30, 035, 039, 042) This diagnosis increases the chance that, if sick, Ms. Aldridge could get AKI again, develop chronic kidney disease, or other complications.

AKI, "also known as acute renal failure (ARF), is a sudden episode of kidney failure or kidney damage," which "causes a build-up of waste products in [the] blood and makes it hard for [the] kidneys to keep the right balance of fluid in [the] body."[47] Having AKI increases the chances that a person will develop kidney disease, stroke, heart attack, or having AKI again.[48]

Doctors have observed a disturbing relationship between COVID-19 and AKI. More than 20% of hospitalized COVID-19 patients and 50% of patients in the ICU

---

[46] *See, e.g.*, *United States v. Gorai*, 2020 WL 1975372, at *3 (D. Nev., Apr. 24, 2020) ("[D]efendant's asthma falls squarely within the ambit of preexisting conditions that the CDC has unambiguously explained place him at greater risk of COVID-19"); *United States v. Norris*, No. 3:18-cr-243, Dkt. 37 (D. Conn., Apr. 16, 2020) (granting reduction where only risk factor identified was asthma); *United States v. Wen*, 2020 WL 1845104 (W.D.N.Y., Apr. 13, 2020) (granting reduction for 48-year old defendant where only risk factor was history of asthma; noting *possible* positive case at institution).

[47] Nat'l Kidney Foundation, *Acute Kidney Injury (AKI)*, https://www.kidney.org/atoz/content/AcuteKidneyInjury#:~:text=Acute%20kidney%20injury%20(AKI)%2C,of%20fluid%20in%20your%20body (last visited Dec. 3, 2020).

[48] *Id.*

develop AKI, and so it "is now recognized as a common complication of COVID-19."[49] One study found that older age, being Black, diabetes, and hypertension "were significant predictors of AKI during hospitalization" for COVID-19.[50] In short, there is a very strong likelihood that Ms. Aldridge would develop AKI again and suffer long-term effects if she gets sick with COVID-19.

*Deep Vein Thrombosis.* Ms. Aldridge has been diagnosed with deep vein thrombosis (DVT) since 2017. (Ex. A, Medical Records, ALDRIDGE_002) In October 2019, Ms. Aldridge was admitted to the hospital because of pain and numbness to the right side of her face. Doctors concluded that it could be related to her DVT. (*Id.*, 136–37) DVT occurs when a blood clot forms in one or more of the deep veins in the body. It is very serious because the blood clots can lead to pulmonary embolism.[51] Ms. Aldridge's history of DVT increases the risk of severe complications from COVID-19.

Although the CDC does not recognize DVT as a risk factor for severe COVID-19 illness, research increasingly shows that COVID-19 9impacts the blood-clotting

---

[49] Nadim, Mitra K., Forni, Lui G., & Kellum, John A., *COVID-19-associated acute kidney injury: consensus report of the 25th Acute Disease Quality Initiative (ADQI) Workgroup*, 16 Nature Rev. Nephrology 747–64 (2020), https://www.nature.com/articles/s41581-020-00356-5; *see also* Batlle, Daniel, et al., *Acute Kidney Injury in COVID-19: Emerging Evidence of a Distinct Pathophysiology*, 31 J. of Am. Soc'y of Nephrology 1380–83 (July 2020), https://jasn.asnjournals.org/content/31/7/1380.

[50] Webb, Melissa, *Acute kidney injury with COVID-19 shows potential for 'lifetime' impact*, Nephrology News & Issues (Nov. 18, 2020), https://www.healio.com/news/nephrology/20201118/acute-kidney-injury-with-covid19-shows-potential-for-lifetime-impact.

[51] Mayo Clinic, *Deep vein thrombosis (DVT)*, https://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/symptoms-causes/syc-20352557 (last visited Dec. 3, 2020).

system.[52] The novel coronavirus often causes blood clots, which can lead to more serious issues, such as strokes, kidney failure, heart inflammation, and an immunocompromised state.[53] "Data suggest that about one-in-three individuals critically ill with COVID-19 will develop a potentially life-threatening blood clot," and there "are reports that patients with milder illness, or even those who are asymptomatic or unaware that they are infected with the coronavirus, are developing dangerous blood clots."[54] Most troubling, there is evidence that medication does not reliably mitigate the risk of blood clotting in COVID-19 patients.[55] And it seems people who show no other COVID-19 symptoms have also developed blood clots.[56]

This evidence about the link between COVID-19 and DVT has prompted at least three district courts to find there were extraordinary and compelling reasons to

---

[52] *Systemic review finds high risk of deep vein thrombosis and pulmonary embolism in COVDI-19 patients*, Venous News (Oct. 15, 2020), https://venousnews.com/systematic-review-finds-high-risk-of-deep-vein-thrombosis-and-pulmonary-embolism-in-covid-19-patients/.

[53] Taylor Ardrey, *COVID-19 Autopsy Study Finds Blood Clots in 'Almost Every Organ', Pathologist Says*, Business Insider (July 13, 2020), https://www.sciencealert.com/covid-19-patient-autopsies-show-blood-clots-in-almost-every-organ-pathologist-says.

[54] Nat'l Blood Clot Alliance Press Release, *CDC Grant Supports National Blood Clot Alliance COVID- 19 Research* (July 28, 2020), available at https://www.stoptheclot.org/news/grant-supports-covid-19-research/.

[55] Cassandra Willyard, Coronavirus Blood Clot Mystery Intensifies, Nature (May 8, 2020), available at https://www.nature.com/articles/d41586-020-01403-8.

[56] Davoodi, Lotfollah et al., *COVID-19 Presented With Deep Vein Thrombosis: An Unusual Presenting*, 8 J. of Investigative Med. High Impact Case Reports, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7273555/.

grant a sentence reduction to defendants with a blood-clot disorder, including DVT.[57] This Court should do the same.

*Peptic Ulcer Disease.* In February 2020, Ms. Aldridge was diagnosed with an H. pylori infection, the bacteria primarily responsible for peptic ulcers. (Ex. A, Medical Records, ALDRIDGE_002, 103) Peptic ulcers are sores on the lining of the stomach or the beginning of the small intestine.[58] These ulcers cause abdominal discomfort, weight loss, nausea, and vomiting, among other conditions.[59]

Although the CDC does not identify peptic ulcers as a risk factor for severe COVID-19 illness, at least one study found that a SARS-CoV-2 infection and peptic ulcers led to increased incidence of gastrointestinal bleeding.[60] These findings are consistent with other reports found that nearly a third of people sick with COVID-19 experienced GI symptoms.[61] While these studies do not suggest that these GI

---

[57] *See United States v. Santilli*, No. 18 CR 357-1, 2020 WL 6446665, at *2 (N.D. Ill. Nov. 3, 2020); *United States v. Hanson*, —— F.Supp.3d ——, 2020 WL 3605845 (D. Ore. July 2, 2020) (finding "extraordinary and compelling circumstances" where the defendant suffered from medical conditions, including blood clots and asthma); *United States v. Smith*, 454 F.Supp.3d 310, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020) (same, where defendant suffered from blood clots, asthma, a thyroid condition, and multiple myeloma).

[58] Oregon Clinic, *H. Pylori and Peptic Ulcers: Overview*, https://www.oregonclinic.com/h-pylori-and-peptic-ulcers#overview-tab (last visited Dec. 3, 2020).

[59] Oregon Clinic, *H. Pylori and Peptic Ulcers: Symptoms*, https://www.oregonclinic.com/h-pylori-and-peptic-ulcers#symptoms-tab (last visited Dec. 3, 2020).

[60] Melazzini, Federica et al., *Peptic Ulcer Disease as a Common Cause of Bleeding in Patients with Coronavirus Disease 2019*, 115 Am. J. of Gastroenterology 1139-1140 (2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7273934/.

[61] White, Tracie, *Gastrointestinal symptoms common in COVID-19 patients, Stanford study reports*, Stanford Med. News Ctr. (Apr. 16, 2020), https://med.stanford.edu/news/all-news/2020/04/stomach-complaints-common-in-covid-19-patients.html.

symptoms increase the risk of severe illness or death, they suggest that Ms. Aldridge could have significant complications and extreme discomfort if she becomes sick with COVID-19.

*Dysphagia.* Ms. Aldridge has had difficulty swallowing for some time. She has had procedures to expand her esophagus, but her difficulty swallowing has persisted. In October 2020, Ms. Aldridge was admitted to the hospital because of worsening dysphagia. This condition can cause people to choke on their food or vomit.[62]

The most common symptom of COVID-19 is acute respiratory distress, which requires invasive respiratory support, such as intubation and the use of ventilators. These necessary interventions can lead to dysphagia even in healthy patients.[63] These interventions are therefore likely to worsen in a patient with dysphagia. For that reason, at least one district court has granted a reduced sentence to a defendant who, like Ms. Aldridge, had dysphagia, difficulty eating, which increased the risk of choking.[64]

\* \* \*

Ms. Aldridge has very serious medical conditions. If she were to become sick with COVID-19, the consequences may be fatal. These conditions in combination with

---

[62] Mayo Clinic, *Dysphagia*, https://www.mayoclinic.org/diseases-conditions/dysphagia/symptoms-causes/syc-20372028 (last visited Dec. 3, 2020).

[63] Ranjini Mohan & Bijoyaa Mohapatra, *Shedding Light on Dysphagia Associated with COVID-19: The What and Why*, OTO Open (Apr. 2020), https://journals.sagepub.com/doi/full/10.1177/2473974X20934770#articleCitationDownloadContainer.

[64] *United States v. Scarpa*, No. 94-CR-1119-1 (ERK), 2020 WL 6591455, at *2–3 (E.D.N.Y. Nov. 11, 2020) (reducing the sentence of a person convicted of conspiracy to commit murder).

the pandemic create an extraordinary and compelling reason to reduce Ms. Aldridge's sentence.

### D. COVID-19 poses acute risks to people in BOP custody

Public health experts agree that interventions, such as widespread testing, PPE, hygiene and cleanliness, and responsible release of high-risk patients could help stop the disease from spreading.[65] The National Academies of Sciences, Engineering, and Medicine (NAS) has concluded that lowering prison populations is an essential step to save lives and control the spread of COVID-19.[66] Indeed, BOP Director Carvajal acknowledged in June that "[p]risons by design are not made for social distancing. They are on the opposite made to contain people in one area."[67] Interventions are needed even after COVID-19 has swept through a facility: "Re-infection with [COVID-19] has been documented, with some individuals presenting with more severe disease than the first infection," and "[p]risons are prime spaces for re-exposures."[68]

---

[65] Franco-Paredes, Ghandnoosh, Latif, et al., *Decarceration and community re-entry in the COVID- 19 era*, The Lancet (Sept. 29, 2020), https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(20)30730-1/fulltext.

[66] Nat'l Academy of Sciences, *Decarcerating Correctional Facilities during COVID-19* (2020), https://www.nap.edu/catalog/25945/decarcerating-correctional-facilities-during-covid-19-advancing-health-equity-and.

[67] Testimony of Dir. Carvajal, Sentate Judicial Hearing Transcript (Jun. 2, 2020), https://www.rev.com/blog/transcripts/senate-judiciary-hearing-transcript-on-incarceration-during-covid-19.

[68] Decl. Tara Vijayan, M.D., M.P.H., available at https://www.fd.org/sites/default/files/covid19/bop_jail_policies_and_information/declaration_of_dr_tara_vijayan_final_-_signed.pdf.

When outbreaks occur in prisons, contagion spreads beyond the confines of jail. NAS explains that "[r]esearch on recidivism suggests that correctional authorities could decarcerate in a manner that would pose relatively little risk to public safety."[69] In contrast, failure to control COVID-19 in prisons is a grave threat to us all: "The virus ripples outward . . . engulfing the families and communities of inmates and workers. The coronavirus does not respect prison walls any more than it respects state or national borders. It will not be confined."[70]

The numbers of positive-COVID-19 cases in BOP continue to increase. There is considerable evidence that the numbers publicly reported by the BOP undercount the number of incarcerated people actually infected. BOP facilities that implemented testing saw dramatic increases in the number of cases.[71] Media accounts confirm that many who test positive for COVID-19 in BOP receive virtually no care, and that staff have "ignored or minimized . . . COVID-19 symptoms, and mixed the sick and healthy together in haphazard quarantines."[72]

---

[69] NAS, *Decarcerating Correctional Facilities*, *supra* at S-2.

[70] Editorial Board, *America is Letting the Coronavirus Rage Through Prisons: It's both a moral failure and a public health one*, N.Y. Times SR6 (Nov. 21, 2020), available at https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

[71] *See, e.g.*, Walter Pavlo, *After Seeing Federal Bureau of Prisons Up Close, Federal Judges May See Sentencing Differently in Future*, Forbes (May 3, 2020), shorturl.at/dtN89; Luke Barr, *70% of inmates tested have COVID-19: Bureau of Prisons*, ABC News (May 1, 2020), shorturl.at/ayLRZ.

[72] Keri Blakiger & Keegan Hamilton, *"I Begged Them to Let Me Die": How Federal Prisons Became Coronavirus Death Traps* (June 18, 2020), https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps; *see also* Daniel Brown & Nkechi Taifa, *Congress must do more to protect people in*

The Department of Justice Office of Inspector General (OIG) recently found that "[m]aintaining a safe, secure, and humane prison system remains a challenge for DOJ and the BOP."[73] Those in federal detention who have been spared by COVID-19 still suffer: during the pandemic medical care for chronic conditions has been delayed and, in many cases, withheld entirely. An OIG inspection of Metropolitan Detention Center (MDC) Brooklyn, found that "sick call requests dating to early July 2020 had not been scheduled or seen as of late September 2020."[74] At Butner Federal Medical Center, a lawsuit alleges that when people do get sick with COVID-19, "treatment is almost nonexistent," and that people are generally not transferred to a hospital until "they are already experiencing respiratory failure."[75]

BOP and AG Barr have barely used the tools Congress gave them to safely lower prison populations. The CARES Act authorized AG Barr to dramatically expand the use of home confinement to protect the most vulnerable from COVID-19. Instead,

---

*prisons and jails and those re-entering the community*, Des Moines Register (Sept. 9, 2020), https://www.desmoinesregister.com/story/opinion/columnists/iowa-view/2020/09/09/covid-19-exposes-injustice-treatment-people-in-exiting-prisons/5685625002/.

[73] Michael E. Horowitz, Dep't of Justice, Office of Inspector General, *Top Management and Performance Challenges Facing the Department of Justice* 16 (Oct. 16, 2020), available at https://oig.justice.gov/sites/default/files/reports/2020.pdf.

[74] Dep't of Justice, Office of the Inspector General, *DOJ Releases Report of Remote Inspection of Fedreal Bureau of Prisons Metropolitan Detention Center Brooklyn Examining the Institution's Response to the Coronavirus Pandemic* (Nov. 10, 2020), https://oig.justice.gov/news/doj-oig-releases-report-remote-inspection-federal-bureau-prisons-metropolitan-detention-center.

[75] *Hallinan v. Scarantino*, No. 5:20-cv-00563-M, Compl. ¶¶ 78–79, available at https://www.aclu.org/legal-document/complaint-aclu-files-class-action-lawsuit-against-butner-fcc.

AG Barr and BOP issued restrictive guidance and memos, each "more confusing than the next,"[76] that together establish a "complex set of procedural and logistical hurdles to home confinement."[77] A recent inspection of BOP facilities by OIG revealed numerous institutional failures[78] and underutilization of the tools available to shrink the prison population. OIG's review of the numbers of petitions for compassionate release found that of the 321 petitions submitted at FCI Oakdale, none were granted by the BOP, and the 15 people released early had to seek relief from the courts.[79] Similarly, at FCC Pollock, the BOP approved none of 70 petitions for compassionate release.[80] OIG also found that the use of home confinement based on the guidance provided by the Attorney General and authorized under the CARES Act was similarly stingy.[81]

This grudging use of home confinement is not limited to FCI Oakdale. During the first three months of the pandemic, BOP approved only 11 of the 10,940—0.1%—

---

[76] Harris, Holly, *Blame the Justice Department for Andrea Circle Bear's Death*, N.Y. Times (May 3, 2020), https://www.nytimes.com/2020/05/03/opinion/andrea-circle-bear-coronavirus-prison.html.

[77] Fed. Public & Cmty. Defenders Legislative Committee, Letter to Att'y Gen. William Barr (Apr. 1, 2020), https://www.fd.org/sites/default/files/covid19/defender_letter_ag_barr_re_covid-19_4-1-20_0.pdf.

[78] Dep't of Justice, Office of the Inspector General, *Pandemic Response Report 21-003: Remote Inspection of Federal Correctional Complexes at Oakdale and Pollack* ii–iii (Nov. 2020).

[79] Dep't of Justice, Office of the Inspector General, *Pandemic Response Report 21-003: Remote Inspection of Federal Correctional Complexes at Oakdale and Pollack* 32 (Nov. 2020).

[80] *Id.*

[81] *See id.* at 27–31.

of compassionate release requests it received.[82] Based on a survey of defense attorneys representing clients across the country, Sentencing Resource Counsel to the Federal Public Defenders are not aware of a single BOP-initiated motion for compassionate release based on heightened risk of severe illness from COVID-19 infection. At FMC Carswell, where Ms. Aldridge is supposed to serve her sentence, compassionate release was denied to 346 of the 349 women at the prison who asked.[83] One of the women, who suffered from stage 4 cancer, wrote to the judge and warden about the lack of treatment and the prison's failure to contain the virus. She died of COVID-19.[84]

In short, this Court cannot rest assured that Ms. Aldridge will receive the medical care she needs or be protected if there is another outbreak at FMC Carswell. Nor can this Court assume that the facility will even respond to a request for help, should she file one.

### E. A sentence reduction is consistent with the goals of § 3553(a)

The § 3553 factors also favor a sentence reduction. At the time of Ms. Aldridge's sentencing, nobody could have foreseen that a global pandemic would have devastating effects in our communities and prisons. But the COVID-19 pandemic has changed

---

[82] Keri Blakinger & Joseph Neff, *Thousands of Sick Federal Prisoners Sought Compassionate Release. 98 Percent Were Denied*, The Marshall Project (Oct. 7, 2020), https://www.themarshallproject.org/2020/10/07/thousands-of-sick-federal-prisoners-sought-compassionate-release-98-percent-were-denied.

[83] *Id.*

[84] *Id.*

everything, and it should impact this Court's assessment of an appropriate sentence for Ms. Aldridge.

The government and this Court have already achieved many of the goals of punishment by prosecuting and sentencing Ms. Aldridge. The conduct stopped. The certainty of getting caught and the embarrassment of a criminal conviction will do more to deter her from repeating this behavior than five months in prison.[85] She is not a violent person and has been in perfect compliance with the conditions of her release. There simply is no need to protect the public from Ms. Aldridge. Months in prison will do little to rehabilitate this elderly woman with a Ph.D. And Ms. Aldridge has already made steps towards paying restitution by agreeing to the garnishment of 10% of her pension.

In the end, retribution is the only reason to require Ms. Aldridge to serve time in prison. She is not trying to escape punishment; Ms. Aldridge acknowledges the severity of her crime. But retribution alone is not sufficient justification to require her to spend five months in prison, where she faces the very real possibility of severe illness or death.

Twelve months in home detention will send the message that defrauding the Social Security Administration is serious without compromising Ms. Aldridge's health. Under home confinement, she would "not enjoy the absolute liberty to which every citizen is entitled," and terms of release are no "act of leniency" but a "substantial

---

[85] Dep't of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (May 2016), https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

restriction of freedom" in which she would "always face the harsh consequences that await if [s]he violates."[86] Ms. Aldridge would be confined at her home instead of at FMC Carswell, but she would remain confined. In addition to this confinement, she will face the other aspects of his punishment—including the collateral consequences of a felony conviction and the obligation to pay the restitution she owes.

## CONCLUSION

This Court should reduce Ms. Aldridge's sentence to time served followed by 12 months of supervised release with a special condition that she serve that term on home detention.

<div style="margin-left:auto;">

Respectfully submitted

**FEDERAL COMMUNITY DEFENDER**

s/ Colleen P. Fitzharris
Attorney for Willie Aldridge
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5868
E-mail: colleen_fitzharris@fd.org

</div>

Date:  December 7, 2020

---

[86] *Gall v. United States*, 552 U.S. 38, 44, 48 (2007).

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification to opposing counsel.

Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/ Colleen P. Fitzharris
Attorney for Willie Aldridge
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5866
E-mail: colleen_fitzharris@fd.org